**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>ZACKARY ELLIS SANDERS,<br><br>               Defendant. | Case No. 1:20-mj-00114 |

**OBJECTION TO THE GOVERNMENT'S MOTION TO EXTEND TIME FOR**
**INDICTMENT AND RENEWED MOTION TO RELEASE ZACKARY SANDERS**

Mr. Zackary Sanders, through counsel, files his Objection to the Government's Motion to Extend Time for Indictment, and renews his request to be released on GPS monitoring, on very strict conditions, with his parents, Dr. Jay Sanders and Dr. Risa Sanders, serving as third party custodians.

Mr. Sanders is in solitary confinement at the Alexandria Detention Center ("ADC"). Although he has now been detained for twenty-four days, he is still in the "intake" section of the facility. Because the intake section was not intended to house prisoners for days at a time (not to mention weeks), it is entirely unsuitable for this purpose. The lights remain on 24 hours a day.[1] Mr. Sanders is not permitted any in-person contact meetings with counsel or his family. He can only leave his cell for two hours a day and is not allowed outdoors. The conditions are unsafe

---

[1] Undersigned counsel Jonathan Jeffress has contacted the Alexandria Sheriff's Office on multiple occasions to request respectfully that the lights be turned down or off in Mr. Sanders' cell during sleeping hours. Though ASO Captain Davey promised to investigate the matter, the lights have remained the same. Counsel can conceive of no COVID-19 related justification for leaving the lights on in a detainee's cell for 24 hours a day, nor did Captain Davey offer one.

and unsanitary:  dust falls from the ventilation unit and food is placed directly on metal surfaces that have been touched by many people.  Mr. Sanders has not been given a mask.  When he uses the jail phone—his only lifeline to the outside world—there are no cleansing wipes or sanitizing solution available to render it safe.

The highly contagious and deadly COVID-19 pandemic—the proffered justification for extending the time to indict Mr. Sanders—poses a high risk to the community from which grand jurors are selected, but a much higher risk to those from our community who are detained in jails.  Jails such as ADC are like petri dishes, where the virus spreads like wildfire—even faster than on cruise ships and in nursing homes, environments that have been incubators for the virus and killed so many.  The Cook County jail in Chicago is now the country's largest known source of infection of COVID-19.  The risk of infection is high to both Mr. Sanders, who cannot socially distance himself and is housed in unsanitary conditions, and to the staff and contractors who come in and out of the facility.  Moreover, Mr. Sanders is especially at risk to become seriously ill and die from contracting the virus, given his underlying health conditions.

Under the Court's April 9, 2020 Order, Mr. Sanders must remain at ADC awaiting indictment—at risk of contracting the virus and without in-person access to legal counsel—for nine weeks longer than mandated under the Speedy Trial Act.  The Court's Order similarly eviscerates his right to a speedy trial.  Respectfully, in promulgating its Order and extending substantially every conceivable speedy trial deadline, the Court did not consider the serious health risk to Mr. Sanders, or the ways in which the ability to prepare his defense are undermined.  In doing so, the Court failed to weigh sufficiently Mr. Sanders' rights, as the Speedy Trial Act and the United States Constitution require the Court to have done.

Mr. Sanders thus files this objection under the Speedy Trial Act and the Fifth and Sixth Amendments to the government's motion and the Court's ruling (without allowing Mr. Sanders an opportunity to be heard) permitting the government additional time to indict him.  To be clear, if Mr. Sanders were released, and the immediate danger of illness and death was not at issue, Mr. Sanders would likely not object to the extension.[2] But his health is in danger, he does not have adequate access to counsel, and, given the highly contagious COVID-19 pandemic's rapid spread in jails, he poses more risk to the community incarcerated than he does at home, under the very strict conditions prescribed by the Adam Walsh Act.[3] *See* ECF 15 at 11 n. 4.

Mr. Sanders therefore additionally renews his motion to revoke the detention order under 18 U.S.C. § 3142(b), in light of the Court's order (ECF 23), or, in the alternative, moves for his temporary release under 18 U.S.C. § 3142(i), because compelling reasons exist to release him temporarily, at least, for so long as the COVID-19 pandemic continues.

## **PROCEDURAL HISTORY**

1.      On February 12, 2020, the FBI executed a search warrant at Mr. Sanders' home, where he lives with his parents.  Mr. Sanders cooperated with law enforcement during the search, providing screen names and passwords for devices that law enforcement sought to search.

---

[2] Mr. Sanders stated to the government, prior to the government filing its Motion for Extension, that his objection was conditional on Mr. Sanders' continued detention—i.e., if he were released, he would not object.

[3] *See*, *e.g., United States v. Harris*, ECF No. 36, Case No. 19-356 (D.D.C. Mar. 27, 2020) (releasing defendant who had already pled guilty to distribution of child pornography pending sentencing where defendant would be released to his father's home under "strict conditions," including no internet access, finding that COVID-19 constituted "exceptional circumstances" for release and noting that "uncertainty" about whether the defendant would contract the virus should not prevent the court from acting); ECF No. 35 ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on these strict conditions.").

Following the search, and with full knowledge of the investigation and its nature, Mr. Sanders took no steps to obstruct justice or to flee the jurisdiction.

2.      On March 19, 2020, the government charged Mr. Sanders, by Criminal Complaint, with a violation of 18 U.S.C. §§ 2251(a) and (e).

3.      On March 20, 2020, Mr. Sanders was arrested and the Magistrate conducted a detention hearing the same day.  Mr. Sanders was ordered detained.

4.      On March 27, 2020, Mr. Sanders filed a Motion to Revoke Detention Order (ECF 13).  The government filed an Opposition on April 1, 2020 (ECF 15).  Mr. Sanders filed a Reply that same day (ECF 16).  On April 2, 2020, the Court issued an order denying Mr. Sanders' Motion to Revoke.

5.      On April 9, 2020, at 9:22 a.m., the government filed a Motion to Extend Time for Indictment and Memorandum in Support (ECF 22).  Though the government represented that Mr. Sanders objected to the Motion, the government did not state the conditional nature of Mr. Sanders' objection—that Mr. Sanders objected to the extent that he would remain detained during the additional period of time the government was requesting.

6.      Less than two hours later, before Mr. Sanders had the opportunity to file an opposition, this Court granted the government's Motion in an Order (ECF 23).

7.      Since being arrested on March 20, 2020, Mr. Sanders has been in solitary confinement in the booking/intake area of ADC.  *He has not had an in-person meeting with a lawyer or a family member since his arrest*.  His legal visits are limited to video conferences that are strictly time-limited and are no substitute for in-person communication.  The lights remain on in his cell 24 hours a day—a well-recognized form of torture capable of permanently damaging the human brain.  The conditions are unsafe in many other ways, as well, with the inmates forced

4

to come into contact with surfaces that many others have touched with no ability to sanitize them.[4]  Notably, while the guards carry protective gear including masks, the inmates have received no protective gear whatsoever, in direct contravention of applicable guidance from the Center for Disease Control (CDC).

## **FACTUAL BACKGROUND REGARDING THE COVID-19 PANDEMIC**

We are facing a serious and urgent public health crisis.  On March 11, 2020, the World Health Organization officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[5]  Since then, the United States has become the epicenter of the virus.  This past week, experts projected that the D.C. metro area will be the next "hotspot" for a COVID-19 outbreak.[6]  Individuals in jails are at an especially high risk to contract the virus because they are kept in unsanitary conditions and have no choice about whether and how they come into contact with others.  They have no option to do what the vast majority of Americans are doing right now— wearing protective gear (such as a face mask), sanitizing surfaces in their immediate environments, and staying at home, away from other people, to stop the spread of this once-in-a-century contagion.

### *This Court's General Orders and COVID-19*

This Court's General Orders outline COVID-19's risk to the public and need not be fully repeated here.  Several points, however, warrant emphasis and expansion.  First, General Orders

---

[4] Undersigned counsel understands that Mr. Sanders may be moved out of the booking area once he has been at the jail for 30 days. However, previously, Mr. Sanders was told that he would be moved out of the booking area after 14 days.

[5] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS (last visited April 13, 2020).

[6] Colleen Grablick,  *"About Two Weeks Behind New York"*: *D.C. is on Track to Become a Coronavirus Hotspot*, NPR (April 8, 2020), https://www.npr.org/local/305/2020/04/08/829844443/about-two-weeks-behind-new-york-d-c-is-on-track-to-become-a-coronavirus-hotspot (last visited April 13, 2020).

06 and 07 are correct—the nationwide spread of COVID-19 is an "ongoing health emergency," the President has recommended that Americans avoid gathering in groups of more than ten people, people with serious underlying conditions should stay home when possible, and "all Americans" should "avoid close contact with other people (i.e., being within six feet)."  General Orders 2020-07 and 2020-06 at 1-2.  It is beyond question that Mr. Sanders, so long as he is incarcerated, does not have the ability to take any of those steps necessary for mitigating COVID-19's spread.

Second, the situation described in the General Orders has only worsened over time and since the Court issued its orders.  Governor Northam declared a State of Emergency for Virginia on March 12.[7]  On March 15, Governor Northam used his emergency powers to ban gatherings of 100 or more people."[8]  Two days later, on March 17, Governor Northam restricted gatherings to less than 10 people.[9]  Those restrictions have since become more stringent—on, March 30, 2020, Governor Northam ordered all individuals in Virginia to "remain at their place of residence" and if individuals go outside, "they must at all times maintain social distancing of at least six feet from any other person" until June 10, 2020.[10]

---

[7]*Governor Northam Declares State of Emergency, Outlines Additional Measures to Combat COVID-1*, Virginia Governor's website, (March 12, 2020),
 https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-853537-en.html (last visited April 13, 2020).
[8]*Northam bans gatherings of 100+ people, says it's not yet time for quarantine*, WDBJ (March 15, 2020) https://www.wdbj7.com/content/news/Northam-bans-gatherings-of-100-people-says-its-not-yet-time-for-quarantine-568813011.html (last visited April 13, 2020).
[9] *Governor Northam Announces New Measures to Combat COVID-19 and Support Impacted Virginians*, Virginia Governor's website (March 17, 2020)
https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854487-en.html (last visited April 13, 2020).
[10]*Executive Order No. 55*, Virginia Governor's website (March 30, 2020)
https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-55-Temporary-Stay-at-Home-Order-Due-to-Novel-Coronavirus-(COVID-19).pdf (last visited April 13, 2020).

By the time of this Court's April 6th General Order 2020-11, the United States had become the "epicenter" of the pandemic and had "far more confirmed cases than any other nation."  General Order 2020-11 at 1.  There were 10,938 total COVID-19 deaths in the United States as of April 6, 2020.[11]  There have now been nearly double that—20,486 COVID-19 deaths in the United States.  As of Saturday, the United States has the world's highest number of COVID-19 deaths.[12]  Though Virginia's "known" cases were "relatively lower than many other states" as of March 24, 2020, *see* General Order 2020-07 at 3, the number of infections and deaths have exponentially increased in the intervening weeks.  At the time of filing, Virginia has 5,747 confirmed cases and 149 deaths.[13]  Most of those cases are concentrated in this Judicial District.

### *Conditions of Confinement and Spread of COVID-19*

This Court's General Orders fail to consider the effect of COVID-19 on incarcerated individuals.  General Order 2020-06, which addresses computation of time under the Speedy Trial Act and on which the government and this Court relied to extend the time the government has to indict Mr. Sanders by 67 days, remarkably evinces no concern whatsoever for the rights— not to mention the welfare—of detained defendants.  That is notwithstanding the fact that the

---

[11]Lazaro Gamio and Karen Yourish, *See How the Coronavirus Death Toll Grew Around the United States*, New York Times (April 6, 2020) https://www.nytimes.com/interactive/2020/04/06/us/coronavirus-deaths-united-states.html (last visited April 13, 2020).
[12]Derek Hawkins, Marisa Iati, et al., *Confirmed U.S. covid-19 death toll reaches 20,000, highest in the world,* The Washington Post (April 11, 2020) https://www.washingtonpost.com/world/2020/04/11/coronavirus-latest-news/ (last visited April 13, 2020).
[13]Virginia Department of Health COVID-19 website, http://www.vdh.virginia.gov/coronavirus/ (last visited April 13, 2020) (note: the website indicates, as of April 13, 2020, that the Department is introducing enhancements to the reporting structure and that the April 12, 2020 count may be an underestimate).

medical community and Virginia public officials have clearly and repeatedly acknowledged the grave risk posed by full jails both to inmates and to the community as a whole.

Robert Greifinger, a physician who spent 25 years working on health care issues inside the nation's prisons and jails, explains that the "social distancing" directive, such as that reflected in Governor Northam's stay-at-home order, is nearly impossible to achieve in an institutional setting.  "There are crowding issues, ventilation issues, security issues where people have to be checked and monitored fairly frequently[.]"[14]  And for "work shifts, the[ staff] come in and out of the facility" and therefore can bring the infection both into and out of the facility.  *Id.*  Dr. Jonathan Giftos, a former medical director at Rikers, agrees that the proximity of people in institutional settings renders it impossible to implement social distancing:  "The halls are small… many [inmates] are escorted in shackles.  You cannot physically distance yourself from other people[.]"[15]

Brian Mathema, an infectious disease epidemiologist at Columbia University, agrees, noting that "[d]ensity is bad."[16]  Mathema was part of a team that studied the spread of tuberculosis at a Brazilian prison—people entered the prison with a low level of infection, but

---

[14]Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus "Incubators,"* NPR (March 13, 2020) https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators (last visited April 13, 2020).

[15]Josiah Bates, *"We Feel Like All of Us Are Gonna Get Corona" Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time Magazine (March 24, 2020), https://time.com/5808020/rikers-island-coronavirus/ (last visited April 13, 2020).

[16]Anna Flagg and Joseph Neff, *Why Jails Are So Important in the Fight Against Coronavirus*, The Marshall Project (March 31, 2020) https://www.themarshallproject.org/2020/03/31/why-jails-are-so-important-in-the-fight-against-coronavirus?utm_medium=email&utm_campaign=newsletter&utm_source=opening-statement&utm_source=newsletter-20200331-1905&utm_source=The+Marshall+Project+Newsletter&utm_campaign=e6df8704ef-EMAIL_CAMPAIGN_2020_03_31_11_34&utm_medium=email&utm_term=0_5e02cdad9d-e6df8704ef-174441905 (last visited April 13, 2020).

within six months, that rate shot up 30 times and remained high.  The levels remained high not

only in the prison, but also in the surrounding community.  Mathema sees parallels with the

coronavirus, noting especially the lower levels of immunity in incarcerated populations. *Id.*

Dr. Brie Williams, a professor of medicine at the University of California, San Francisco

and director of the University's Criminal Justice & Health Program, and a former consultant for

the California Department of Corrections, explains in the attached affidavit:

> Because inmates live in close quarters, there is an extraordinarily high risk of
> accelerated transmission of COVID-19 within jails and prisons. Inmates share small cells,
> eat together and use the same bathrooms and sinks. They eat together at small tables that
> are cleaned only irregularly. Some are not given tissues or sufficient hygiene supplies.
> Effective social distancing in most facilities is virtually impossible, and crowding
> problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer
> or sufficient opportunities to wash hands.

Ex. 1 at 3.  Dr. Williams also notes that COVID-19 has infected and rendered seriously ill not

only the young, but the old.  *Id*. at 5.

Facilities such as ADC have an extremely limited capability to manage the virus and even

less ability to treat the incarcerated once the virus hits:  not all facilities have healthcare centers,

and "[e]ven those facilities that do have healthcare centers can only treat relatively mild types of

respiratory problems for a very limited number of people."  *Id*. at 4.  Correctional officers are at

a high risk for infection, and then, given how highly communicable COVID-19 is, are likely to

spread the virus into the community and throughout the facilities.[17]  The spread of COVID-19 in

jails is thus not only a problem for the people in those jails; it puts all Virginia citizens at risk.

Governor Northam's website announces that he "is encouraging local criminal justice

officials, including Commonwealth's attorneys, defense attorneys, sheriffs, and other jail

---

[17] It is counsel's understanding that the medical staff at ADC work at multiple jails in the region
and thus are possible vectors for the virus as it spreads.

officials, to explore proactive measures to combat the spread of COVID-19 while ensuring public safety," which include measures like modifying sentences to reduce jail populations, diverting offenders from being admitted to jail, and using alternatives to incarceration, such as home detention with electronic monitoring.[18]  Brian Moran, Secretary of Public Safety and Homeland Security, said, "We want to reduce the interaction and particular [sic] this vulnerable population that may exist in our jails."[19]  Virginia Beach Sheriff Ken Stolle recently stated, "I've never been this concerned about the working conditions and what's going to happen in the jail. If it gets into the jail it's going to be too late because it would spread like wildfire."[20]

In jails and prisons across the country, the virus is spreading like "wildfire" in conditions that resemble "petri dishes."  "Hundreds of Covid-19 diagnoses have been confirmed at local, state and federal correctional facilities—almost certainly an undercount, given a lack of testing and the virus's rapid spread—leading to hunger strikes in immigrant detention centers and demands for more protection from prison employee unions."[21]  A Cook County Commissioner called the jail a "petri dish" weeks ago.  *Id.*  Now the jail in Chicago is "the

---

[18]*Governor Northam Announces Additional Actions to Address COVID-19*, Virginia Governor's website (March 19, 2020)  https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-854722-en.html (last visited April 13, 2020).

[19]Matthew Fultz, *Northam encourages police to avoid arrests, imprisonment in wake of COVID-19 virus*, WTVR https://www.wtvr.com/news/local-news/northam-encourages-police-to-avoid-arrests-imprisonment-in-wake-of-covid-19-virus (last visited April 13, 2020).

[20] Evan Watson, *Coronavirus threat to jails:" If it gets in, it's going to spread like wildfire."* 13 News Now (March 18, 2020), https://www.13newsnow.com/article/news/health/coronavirus/coronavirus-threat-to-jails-if-it-gets-in-its-going-to-spread-like-wildfire/291-045fe84b-bd32-4cdf-a406-60bac9467039 (last visited April 13, 2020).

[21] Timothy Williams, Benjamin Weiser, and William K. Rashbaum, *"Jails are Petri Dishes": Inmates Freed as the Virus Spreads Behind Bars*, New York Times (March 30, 2020) https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (last visited April 13, 2020).

nation's largest-known source of coronavirus infections."[22]  And just across the river, in D.C.,

the number of inmates infected increased by nearly seven-fold last week, prompting a class-

action lawsuit by the Public Defender Service and the D.C. ACLU and joined by the correctional

officers' union.[23]  The first inmate death at the D.C. jail was reported today.[24]  As of the date of

filing, there were 66 confirmed cases of inmates and staff infected with COVID-19 in Virginia

Department of Corrections facilities, up from 47 cases only four days prior.[25]

---

[22] Timothy Williams and Danielle Ivory, *Chicago's Jail is Top U.S. Hotspot as Virus Spreads Behind Bars*, New York Times (April 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last visited April 13, 2020).

[23] Natalie Delgadillo, *Coronavirus Cases at the D.C. Jail Have Grown Seven-Fold Since Last Week*, DCist (April 8, 2020) https://dcist.com/story/20/04/08/coronavirus-cases-at-the-d-c-jail-have-grown-seven-fold-since-last-week/ (last visited April 13, 2020); *see also* David Shortell, Kara Scannell, and Manu Raju, CNN (April 11, 2020) https://www.cnn.com/2020/04/10/politics/exclusive-interview-bop-carjaval/index.html (last visited April 13, 2020) (reporting over 300 confirmed cases in the Bureau of Prisons and at least nine deaths); Asher Stockler, *More than 700 People Have Tested Positive on Rikers, Including Over 440 Staff*, Newsweek (April 8, 2020), https://www.newsweek.com/rikers-island-covid-19-new-york-city-1496872 (last visited April 13, 2020) (reporting at least 287 incarcerated people and 441 employees with confirmed cases at Rikers Island jail in New York City); *49 Harris Co. jail workers and 25 inmates now with COVID-19*, ABC 13 (April 12, 2020), https://abc13.com/6098283/ (last visited April 13, 2020) (reporting 49 employees and 25 incarcerated people with confirmed COVID-19 cases in Harris County, Texas).

[24] Andrea Swalec, *Inmate at DC Jail Dies of Coronavirus, in First Virus Death at Facility*, NBC Washington (April 13, 2020)  https://www.nbcwashington.com/news/local/inmate-at-dc-jail-dies-of-coronavirus-in-first-virus-death-at-facility/ (last visited April 13, 2020).

[25] Virginia Department of Corrections website, COVID-19 updates (April 13, 2020) https://vadoc.virginia.gov/news-press-releases/2020/covid-19-updates/ (last visited April 13, 2020); Alonzo Small, *"My son is essential to me": Car rally go-ers condemn Virginia's failure to keep inmates safe during COVID-19* (April 10, 2020), https://www.wric.com/news/local-news/richmond/my-son-is-essential-to-me-car-rally-go-ers-condemn-virginias-failures-to-keep-inmates-safe-during-covid-19/ (last visited April 13, 2020) (reporting that there were 47 confirmed cases of COVID-19 in Virginia DOC as of April 9, 2020).

***Mr. Sanders' Increased Risk for Serious Illness if Infected With COVID-19***

Mr. Sanders is at a heightened risk for serious illness and death if he contracts COVID-19.  First, though Mr. Sanders is not old, even relatively young and healthy people are at risk for serious illness and death from COVID-19.[26]  Over 40 percent of those who tested positive for the virus in New York were between the ages of 18 and 44.[27]  According to the CDC, nearly 40 percent of patients sick enough to be hospitalized in the U.S. were between the ages of 20 and 54.[28]  Men are also becoming seriously ill and dying at higher rates than women—as of April 9, more than 60 percent of deaths in New York were men.[29]

Further, Mr. Sanders has multiple comorbidities that place him a higher risk than others in his age group for illness or even death.  He is overweight and suffers from hypertension.  *See* Ex. 2 (January 11, 2020 Inova after visit summary) (reflecting 145/98 blood pressure).[30] Hypertension is a well-known risk factor for complications from COVID-19.[31]  So is obesity.  A

---

[26] Roni Caryn Rabin, *Young Adults Come to Grips with Coronavirus Health Risks*, New York Times (March 20, 2020), https://www.nytimes.com/2020/03/20/health/coronavirus-millennials-young-adults.html (last visited April 13, 2020) (specifically noting obesity as a risk factor for younger adults).
[27] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing They Can Get Coronavirus, Too*, New York Times (March 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html (last visited April 13, 2020).
[28]  Pam Belluck, *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in the U.S.*, New York Times (March 18, 2020), https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html (last visited April 13, 2020).
[29] Katherine Harmon Courage, *Why Are Fewer Women Dying from the Coronavirus?*, Vox (April 9, 2020), https://www.vox.com/2020/4/9/21215063/coronavirus-covid-19-deaths-men-women-sex-dying-why (last visited April 13, 2020).
[30] Mr. Sanders also reports that his blood pressure has been taken at the jail multiple times and is extremely high.  Counsel is in the process of attempting to get his records from ADC.
[31] American Heart Association Newsroom, (March 31, 2020), https://newsroom.heart.org/news/what-people-with-high-blood-pressure-need-to-know-about-

new letter from researchers at New York University found that individuals under 60 with a body mass index ("BMI") over 35 were 3.6 times more likely to be admitted to critical care and 2.2 times more likely to be admitted to acute care than individuals with a BMI under 30.[32]  Mr. Sanders' BMI is 37.66.  Ex. 3 at 44.

There are additional factors in Mr. Sanders' case that heighten his risk for serious illness. In December 2019, Mr. Sanders had a sinus infection that developed into right eye pain and blurred vision. Ex. 3 at 9.  He went to see an ophthamologist, who detected evidence of optic neuritis, and referred Mr. Sanders to the emergency room.  *Id*.  Mr. Sanders was admitted to Fairfax Hospital for three days, where he received IV solu-medrul.  *Id*.  At the time, his doctor suspected that he may have any of the following inflammatory disorders—multiple sclerosis ("MS"), rheumatologic process sarcoid, MOG antibody disease, or Neuromyelitis optica spectrum disorder.  *Id*. at 11.  All of these are auto-immune conditions that could increase his risk for complications from COVID-19.

Mr. Sanders still suffers from recurrent optic neuritis.  Dr. Dave writes in an April 9, 2020 letter that Mr. Sanders' optic neuritis puts him in a COVID-19 high risk category. Ex. 4. He especially worries about Mr. Sanders having MS. [33] He explains that Mr. Sanders has "recurrent optic neuritis, possible MS—conditions that place him [in a] high risk category for COVID-19 infection (per the national MS Society)."  *Id*.  He cautions that Mr. Sanders "must follow extra

---

covid-19 (last visited April 13, 2020) (confirming that people with elevated blood pressure may be at an increased risk for complications if they contract COVID-19).
[32] University of Minnesota, Center for Infectious Disease Research and Policy, https://www.cidrap.umn.edu/news-perspective/2020/04/new-york-obesity-appears-raise-covid-19-risk (last visited April 13, 2020) (obesity is a risk factor for hospitalization for individuals under 60).
[33]Mayo Clinic website, https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269 (last visited April 13, 2020) (stating that optic neuritis is a symptom of MS).

precautions compared to the general population of his age," including "wearing a mask at all times."  *Id.*

Mr. Sanders' gastrointestinal issues also increase his COVID-19 risk.  He sees Dr. Prosky, a gastrointestinal specialist for "several serious digestive track problems" which include "difficulty swallowing, abdominal pain, chest pain, and rectal bleeding."  ECF 13, Ex. 2. COVID-19 causes gastrointestinal symptoms, can sometimes present in the intestinal tract before it does in the respiratory system, and experts believe that people with gastrointestinal disorders may be at a higher risk for COVID-19 complications.[34]  Taken together, these comorbidities put Mr. Sanders at a high risk of developing serious illness and complications if he contracts COVID-19.

## ARGUMENT

I.    **Mr. Sanders Objects to a Delay in Indictment and Trial While He is Detained, Particularly Under the Current Life-Threatening Conditions of His Incarceration.**

If Mr. Sanders were not incarcerated, he would likely have consented to the government's motion for extension.  He would have been at home and safe from the COVID-19 pandemic.  He would have been able to meet with counsel for extended periods of time to prepare his defense.  The government is trying to have it both ways, however, by relying on an order that outlines the necessity for the citizens of Virginia to stay at home to socially distance safely, while opposing Mr. Sanders' release so that he may be home and able to socially distance safely.

---

[34]DeeDee Stiepan, *Mayo Clinic Expert Explains Gastrointestinal Symptoms Related to COVID-19*, Mayo Clinic (April 8, 2020), https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-expert-explains-gastrointestinal-symptoms-related-to-covid-19/ (last visited April 13, 2020).

Mr. Sanders therefore objects to the government's motion and the Court's Order extending the time in which to indict him.  Originally, his indictment should have been returned on April 19, 2020.  Now, the government has until June 25, 2020—67 days past the indictment's original due date.  This violates Mr. Sanders' rights under both the Speedy Trial Act and the United States Constitution, as set forth below.

First, this is a violation of the Speedy Trial Act.  Mr. Sanders did not consent to the exclusion of this time.  He has a right under the Act to have his case be indicted timely and have his case move forward; that right is all the more important given that he is detained under conditions that severely impact his mental and physical health and his right to present a defense. The Court erroneously afforded his interests essentially zero weight, in clear violation of the Speedy Trial Act.  18 U.S.C.A. § 3161(h)(7)(a) (requiring the Court consider the defendant's best interest in a speedy trial).

Further, the clock between indictment and trial does not start running unless and until a grand jury has indicted him.  18 U.S.C.A. § 3161(e)(1).  *See Barker v. Wingo*, 407 U.S. 514, 537 (1972) (White, J. concurring) ("one of the major purposes of the provision is to guard against inordinate delay between public charge and trial, which… may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.") (quoting *United States v. Marion*, 404 U.S. 307, 320, (1971).  "The longer the delay, the greater the presumptive or actual prejudice to the defendant, in terms of his ability to prepare for trial or the restrictions on his liberty." *United States v. Taylor*, 487 U.S. 326, 340 (1988).  Mr. Sanders objects to the extension for the time to indict him and to the delay in his trial right.

Second, Mr. Sanders' procedural due process rights were violated when this Court granted the government's Motion to Extend Time for Indictment without affording him the opportunity to be heard.  The "right to be heard before being condemned to suffer grievous loss of any kind… is a principle basic to our society."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal citation and quotation omitted).  At the heart of due process is the "opportunity to be heard "at a meaningful time and in a meaningful manner." *Id*.

The "dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

Mr. Sanders' private liberty interest here is clear—he is in jail, and will remain there for an additional 67 days before his case will move forward.

The risk of erroneous deprivation is also clear.  The government and this Court relied on the Court's General Orders, without allowing Mr. Sanders any opportunity to be heard on his objection to the extension and his request to be released in light of the government's request.

The Court's General Orders do not account for Mr. Sanders' particular circumstances. They do not account for the conditions of his confinement, his susceptibility to infection and serious illness, or his access to counsel.  In fact, General Order 2020-06 does not account for the circumstances of any incarcerated people in making its blanket exclusion of time under the Speedy Trial Act, despite the fact that their rights are the ones affected by the Order, and despite their extremely high susceptibility to infection.

Finally, the Government's interest in Mr. Sanders' continued detention is not high.  If Mr. Sanders were released, he would be on 24-hour electronic monitoring, confined to his home with only his parents, prohibited from leaving the house except for medical and legal reasons, and prohibited from using the internet.  He would not be a danger to anyone.  And he would not be able to transmit the virus throughout the jail or strain scarce resources if infected.  The community is safer and better served with Mr. Sanders at home than it is with him at ADC.

Third, Mr. Sanders' continued detention under these conditions violates his rights under the Fifth and Sixth Amendments, and the extension only lengthens the amount of time that Mr. Sanders must suffer under these conditions.  Mr. Sanders objects on those grounds as well.

Mr. Sanders' freedom from pretrial detention is protected by the Due Process Clause of the Fifth Amendment and any government action infringing on that right must be narrowly tailored.  *United States v. Salerno*, 481 U.S. 739, 755 (1987).  And "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

Further, in *Brown v. Plata*, the Supreme Court explained that a prisoner "may suffer or die if not provided adequate medical care.  A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."  563 U.S. 493, 510–11 (2011).  While the claims in *Brown v. Plata* arose under the Eighth Amendment, pretrial detainees likewise have the legal right to adequate medical care, given that their rights are at least as great as those of convicted persons being punished by imprisonment.  Mr. Sanders is entitled to adequate medical care, yet the current conditions of confinement create an unreasonable risk of exposure to COVID-19.

Mr. Sanders is also entitled to conditions that are not punishment.  And yet, his continued

custody in solitary confinement, in a very noisy area of the jail, with the lights on 24 hours a

day—a well-recognized form of torture—are just that, and violate the Eighth Amendment.  *See,*

*e.g. Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir. 2019), *as amended* (May 6, 2019) (upholding

district court's decision that Virginia death row inmates' long-term detention in conditions

amounting to solitary confinement, where the lights were never turned off, "created a 'substantial

risk' of psychological and emotional harm and violated the Eighth Amendment.").  Research

demonstrates that 24-hour exposure to light can cause both physical and mental harm, affecting

bone and muscle strength, causing inflammation, increasing cancer risk, and risk of psychiatric

and mood disorders.[35]  That is precisely why it is used as a form of torture in the first place.

Mr. Sanders' continued detention with limited access to counsel also impacts his Sixth

Amendment right to counsel.  As the Second Circuit recently found in the throes of this

pandemic, "[t]he right to consult with legal counsel about being released on bond, entering a

plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial

witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is

a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders*

*of New York, Inc. v. Bureau of Prisons*, No. 19-1778, 2020 WL 1320886, at *11 (2d. Cir. Mar.

20, 2020).

Due to the COVID-19 pandemic, ADC has suspended all in-person contact visits.  Mr.

Sanders can only have video or phone calls with counsel; and those are both strictly time-limited.

---

[35]Leena Tahkamo, et al., *Systematic review of light exposure impact on human circadian rhythm*,
The Journal of Biological and Medical Rhythm Research, Vol. 36, 2019, issue 2, at
https://www.tandfonline.com/doi/full/10.1080/07420528.2018.1527773; TA Bedrosian and RJ
Nelson, *Timing of light exposure affects mood and brain circuits*, Translational Psychiatry,
(January 31, 2017), at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5299389/.

He cannot meet in a contact setting, in-person with counsel, to review documents and other material related to his case.  There is no end-date for these policies; to the contrary, there is every reason to believe that they will continue as Mr. Sanders is detained for an additional 67 days past the government's deadline to indict him.  *See United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant in a presumption case and, in so doing, explicitly considering limitations on access to counsel in these perilous times, finding "there is no substitute for a face-to-face, in-person, contact meeting between an attorney and his client;" "[t]he disruption to the attorney-client relationship caused by this public health crisis likely will have broader implications for the Court and the administration of justice;" and "[t]he extent of the disruption of the attorney-client relationship and the strain on the Court depends on how long this crisis lasts and how many people are detained pending trial.").

Further, in the likely event that someone at ADC tests positive for COVID-19, the entire facility will go on a total lockdown, halting Mr. Sanders' video and phone calls with counsel, further inhibiting his constitutional rights.  That event will mark the final straw in the total evisceration of Mr. Sanders' right to counsel.

Mr. Sanders is presumed innocent, yet he remains in conditions that are akin to punishment—if not outright torture—and unreasonably impede his right to counsel.  This is the severe prejudice he suffers from the Court's dramatic extension of the timeline to indict while also keeping him detained.

II.     **In Light of the Delayed Indictment, as Well as Additional Information About Mr. Sanders' Health Condition, Mr. Sanders Moves This Court to Reconsider the Denial of the Revocation of the Detention Order**

Because the indictment has now been delayed for 67 days, Mr. Sanders respectfully requests that this Court reconsider its denial of the revocation of the detention order.

Federal courts around the country have released people from jails in recent weeks due to COVID-19 concerns.  *See, e.g., United States v. Mahan*, Case No. 1:19-cr-233-DCN, Dkt. No. 67 (D. Idaho Apr. 10, 2020) (releasing 36-year-old asthmatic defendant with significant criminal history, including aggravated assault and parole violations, charged in 10-year mandatory minimum drug case due to compelling risk posed by COVID-19); *United States McDuffie*, 2020 WL 1659879 (S.D.N.Y. April 3, 2020) (in a post-plea, pre-sentence context, the district court released the defendant under §3145(c)(1) in a drug-distribution case based on "the combination of a once-in-a-lifetime pandemic and an immunized system disorder. . . ."); *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to people in detention); *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant in a presumption case where defendant was on audio and video conducting firearm and drug transactions due to the "urgent priority" of decarcerating, finding "[t]he spillover effect that an outbreak in a pretrial facility would have on the greater community is undeniable and concerning," and explicitly considering Sixth Amendment right to counsel even though that is not a consideration in the Bail Reform Act); *Fraihat v. Wolf*, No. 20-CV-590 (C.D. Cal. Mar. 30, 2020) (noting risk of asymptomatic spread and unsafe conditions in immigration detention mean "[t]he balance of equities tip sharply in [Fraihat's] favor" and thus ordering release); *United States v. Mclean,* No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception.  That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e),

20

but tilts the balance in favor of release."); *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing for defendant sentenced to 121 months on drug distribution charge after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to people in prison); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) ("*[t]he nature* of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *In re Request to Commute or Suspend County Jail Sentences*, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *United States v. Fellela*, 2020 WL 1457877 (D. Conn. March 20, 2020) (in a post- plea, pre-sentence context, the district court released the defendant under §3143(a)(1) in based on his heightened risk); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

The spread of COVID-19 has only accelerated since this Court denied Mr. Sanders' Motion to Revoke his Detention Order, and experts believe that the worst is yet to come in Virginia. *See* n. 6, *supra* (indicating that D.C. region is next "hotspot" for virus). The Cook County jail has become the largest-known source of COVID-19 infection in the U.S. The D.C. jail has seen exponential growth in infection over the last two weeks, as has the Virginia Department of Corrections and the Bureau of Prisons. *See* ns. 23, 24, and 25 *supra*.

These are likely harbingers for what is to come at ADC.  This Court should not wait for things to get worse to release Mr. Sanders.  *See United States v. Harris*, ECF No. 36, Case No. 19-356 (D.D.C. Mar. 27, 2020) (responding to government argument that the court should "wait and see" how the virus develops and that it was uncertain that Mr. Harris—who had pled guilty to distribution of child pornography and was awaiting sentencing—would contract it and become seriously ill, noting that after the government made that argument, one person at the D.C. Jail had tested positive for COVID-19, and finding, "*uncertainty is endemic in the present circumstances, and that uncertainty cannot preclude courts from acting until the damage has been done.*") (Emphasis added).

Further, Mr. Sanders offers here additional information about his susceptibility to serious illness if infected.  He is only 25, but many young people have been seriously infected with COVID-19—age itself is not a protection.  He has multiple comorbidities that mean he could suffer from serious illness if he contracts the virus.  He has hypertension, he is overweight, he has optic neuritis, chronic sinusitis, and gastrointestinal issues.  He was hospitalized for three days and given a high dose intravenous steroid therapy in January, and hospitalized a second time within a few weeks of that.  He was awaiting testing on some very serious conditions— including whether he has MS—prior to his arrest.  He has absolutely no ability to follow up on that testing while he is incarcerated, and thus no ability to begin treatment.  *See* ECF 13 at 12-14. Dr. Dave, Mr. Sanders' doctor and the director of neuroimmunology and the MS center at Inova Neurosciences Institute, wrote a follow-up April 9 letter stating that Mr. Sanders may have MS and thus "must follow extra precautions compared to the general population of his age." Ex. 4. Dr. Dave writes that he is "concerned" that the jail is an "environment that facilitates transmission of COVID" and urges the Court to consider Mr. Sanders' condition.  Given his

comorbidities, if Mr. Sanders contracts COVID-19 in ADC, he could fall very seriously, and perhaps fatally, ill.

On the other hand, *this Court has already found that Mr. Sanders is not a flight risk*.  Mr. Sanders' permanent residence has been in Virginia for nearly his whole life; since turning 18, he left only for college in New York, and even then, returned home for summers.  The FBI executed the search warrant in February; Mr. Sanders never attempted to flee and was at home when he was arrested.

Further, the COVID-19 pandemic and the attendant travel restrictions only diminish Mr. Sanders' flight risk.  Flight simply is not worth it for someone like Mr. Sanders, who is susceptible to serious illness and death if infected.  *See* 18 U.S.C. 3142(g)(3) (noting a judge, when assessing flight, must consider an individual's physical condition); *see also Attorney General's April 6, 2020 Memo to Prosecutors on Pretrial Release* ("… in applying the familiar BRA analysis, which already includes some consideration of the defendant's 'physical and mental condition,' [] you should consider the medical risks associated with individuals being remanded into federal custody during the COVID-19 pandemic.")[36]

Travel is also severely restricted  *See, e.g., U.S. v. Ramos*, 2020 WL 1478307 at *1 (D. Mass. March 26, 2020) ("[T]he court finds that the circumstances of the Covid-19 pandemic diminish" flight risk); *see also U.S. v. Davis*, 2020 WL. 1529158 (D. Md. March 30, 2020) (same).

The community is safer if Mr. Sanders is released, under strict conditions, than if he is left at the jail.  As Dr. Williams writes, "correctional health is public health."  Ex. 1 at 8.  If jail

---

[36] https://www.justice.gov/file/1266901/download at 2.

populations are reduced, that will help "medical professionals spread their clinical care services throughout the remaining population more efficiently." *Id.* It is just common sense to release Mr. Sanders, a first-time offender, who has parents who can serve as third party custodians and is at risk for becoming seriously ill if he contracts COVID-19.

Further, Mr. Sanders proposes the following conditions (which are stricter than the conditions he previously proposed) that should allay the Court's concerns regarding the safety of the community—essentially, Mr. Sanders proposes that he be home, under the supervision of his parents, with no access to the internet (which will be assured because they will physically lock up their devices), and that he only be allowed to leave for medical and legal appointments and appearances:[37]

1. Mr. Sanders' parents, Dr. Jay Sanders and Dr. Risa Sanders, will act as third-party custodians. Both of Mr. Sanders' parents work from home. One of Mr. Sanders' parents would be at home with Mr. Sanders at all times while he is released.

2. Mr. Sanders will be placed on electronic or GPS monitoring, as deemed appropriate by Pretrial Services.

3. Mr. Sanders will only leave his house for (1) court dates in this case, meetings with undersigned counsel, or meetings with Pretrial Services; (2) medical appointments as needed, with prior notice to Pretrial Services. One of Mr. Sanders' parents will accompany him to all court dates, meetings with counsel, and medical appointments.

4. Mr. Sanders shall not access a computer and/or the internet.

5. Mr. Sanders will not possess or use a cell phone or any other device with access to the internet or other applications.

6. Dr. Jay Sanders and Dr. Risa Sanders will keep all of their electronic devices with internet access capability (computers and smartphones) in a locked safe at all times that

---

[37] The government argued in its opposition to Mr. Sanders' revocation of the detention order, at 10, that the conditions of release would expose him to the same risk as at ADC. In counsel's experience, with multiple other clients on supervision in this and other districts, Pretrial Services has taken steps to limit physical contact and still ensure supervision. Further, Mr. Sanders comes into contact with multiple correctional officers and contractors at ADC every day; that will not be true if he is released.

these devices are not on their persons. A photo of the safe that the Sanders purchased is attached.

7. Dr. Jay Sanders and Dr. Risa Sanders will submit a report to the Court every three days, or at whatever interval the Court requests, certifying that all electronic devices within their home have been either in their possession or locked at all times, and that Zackary Sanders has not accessed any electronic devices with internet capability.

8. Mr. Sanders will have no contact with minors under the age of 18.

9. Mr. Sanders will abide by all directives from state, local, and national government pertaining to public health, including COVID-19.

10.     Mr. Sanders will surrender his passport to Pretrial Services.

Though the government has argued that Mr. Sanders' parents are inadequate custodians because he had a smartphone after the execution of the search warrant, that was before he was arrested.  No court had instructed him not to possess a smartphone or access the internet.  The lawyer he retained immediately after execution of the search warrant did not advise that step. Mr. Sanders fully understands how serious this matter is and will abide by these conditions.  Mr. Sanders' parents, too, who are understandably terrified for their son's safety, have every motivation to make sure that he does not access the internet or re-offend.  The government has also argued that Mr. Sanders' parents are poor custodians because he was living in their home at the time of offense.  ECF 15 at 10.  But if the rule were that no one could ever be released to the same place they were living at the time of offense, few people would ever be released on pretrial supervision.  Dr. Risa and Jay Sanders are trusted professionals who are willing to do whatever it takes to make sure that he abides with every condition the Court may impose.  To that end, attached is an additional declaration from Mr. Sanders' parents.  His parents are willing to testify further before the Court to supply additional evidence supporting Mr. Sanders' release under conditions.

III.    **In the Alternative, the COVID-19 Outbreak, and Mr. Sanders' Susceptibility to Infection, Are Compelling Reasons that Justify His Temporary Release Under 18 U.S.C. § 3142(i).**

If this Court will not reconsider the denial of the revocation of Mr. Sanders' detention order in light of granting the government additional time to indict him, Mr. Sanders respectfully requests that the Court issue a temporary release under 18 U.S.C. § 3142(i) until the danger of the pandemic has passed.  Under 18 U.S.C. § 3142(i), a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

District courts nationwide have explicitly found that the COVID-19 pandemic, and the particular risk of infection for people in jails, warrant release under 18 U.S.C. § 3142(i).  *See, e.g.*, *United States v. Tovar*, No. 1:19-cr-341-DCN, Dkt. No. 42 (D. Idaho Apr. 2, 2020) (releasing defendant previously detained in presumption case after finding COVID-19 a compelling basis for release under § 3142(i)); *United States v. Chandler*, 2020 WL 1528120 (S.D.N.Y, March 31, 2020) ("The extraordinary burdens imposed by the coronavirus pandemic, in conjunction with Chandler's right to prepare for his defense, certainly constitute a 'compelling reason' that permit this Court to order the temporary release of Chandler pursuant to 18 U.S.C. § 3142(i)."); *United States v. Hernandez*, 2020 WL 1503106 (S.D.N.Y. March 30, 2020) (finding "compelling reasons exist for temporary release of the defendant from custody [under §3142(i)] during the current public health crisis.")); *United States v. Kennedy*, 2020 WL 1493481 at *4 (E.D. Mi., March 27, 2020) ("Even if defendant did not have a heightened susceptibility to Covid-19, the public health crisis—and its impact on Defendant's ability to present a defense—nonetheless satisfies §3142(i).")); *United States. v. Michaels*, 2020 WL

1482553 (C.D. Ca., March 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason.'").

The COVID-19 pandemic and Mr. Sanders' susceptibility to serious infection if left at the ADC, coupled with the extreme delay in indictment, are compelling reasons that warrant his temporary release at the very least.

## **CONCLUSION**

Mr. Sanders notes his objection to the Speedy Trial Act violation, in light of his ongoing detention, and respectfully requests that the Court release him to home confinement, under very strict conditions, for both his own safety and the safety of the community.

Dated: April 13, 2020                                    Respectfully submitted,

/s/ Jonathan S. Jeffress__
Jonathan S. Jeffress (#42884)
Emily Anne Voshell (#92997)
KaiserDillon PLLC
1099 14th Street, NW
8th Fl. West
Washington, DC 20005
Tel: (202) 640-4430
Fax: (202) 280-1034
jjeffress@kaiserdillon.com
evoshell@kaiserdillon.com

CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which I understand will electronically generate a Notice of Electronic Filing to the government.

Respectfully submitted,

/s/ Emily Voshell
Emily Anne Voshell (#92997)
KaiserDillon PLLC
1099 14th Street, NW
8th Fl. West
Washington, DC 20005
Tel: (202) 640-4430
Fax: (202) 280-1034
evoshell@kaiserdillon.com